**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.J.J.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.D., FATHER | : : : : : : : | |
| | : | No. 157 WDA 2023 |

Appeal from the Order Entered January 10, 2023
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  C-63-OC-2022-184

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY OLSON, J.:          **FILED:  September 12, 2023**

Appellant, S.D. (Father), appeals from the order entered on January 10, 2023, granting a petition filed by the Washington County Children and Youth Social Service Agency (the Agency) to involuntarily terminate Father's rights to his son, J.J.J.D. (J.D. or Child) pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8), and 2511(b).[1]  We affirm.

We briefly summarize the facts and procedural history of this case as follows.  J.D. was born in October 2020.  Mother and Father are married, and both are listed on J.D.'s birth certificate as his parents.  On January 4, 2021, the Agency took Child into care through an emergency verbal order when Child

---

[1] Mother executed a voluntary termination of parental rights and consent to adoption.  The trial court conducted an on-the-record colloquy and granted Mother's request.  Mother is not a party to the current appeal.  The Agency and Child's legal counsel and guardian *ad litem* filed briefs in support of the order terminating Father's parental rights.

was taken to the hospital for emergency medical treatment and there were additional safety concerns with both parents' substance and alcohol abuse, ongoing incidents of domestic violence, and lack of stable housing. Following a hearing on January 4, 2021, and with the agreement of Mother and Father, the trial court granted a petition for shelter care filed by the Agency and Child was placed with his maternal grandparents (Maternal Grandparents), where he currently resides. The trial court further granted both Mother and Father visitation with Child to be supervised by Maternal Grandparents. On January 15, 2021, the trial court adjudicated Child dependent and ordered a permanency plan wherein Father was directed to submit to drug and alcohol testing twice a month, complete drug and alcohol and mental health treatment, obtain and maintain stable housing, complete batterer's intervention counseling, attend parenting classes, and abide by the terms of his federal parole.[2] On March 24, 2021, the trial court granted Father's petition for paternity testing and subsequent testing confirmed Father's paternity of Child.

The trial court held four review hearings thereafter. The trial court found Father minimally compliant with the permanency plan at the first review hearing held on May 4, 2021. On May 11, 2021, the Agency filed a status

---

[2] At the time of Child's adjudication, Father was under federal indictment for the sale of narcotics. On October 22, 2022, Father pled guilty to conspiracy to distribute a quantity of a mixture and substance containing detectable amount of cocaine and was sentenced to time served and four years of probation.

report with the trial court indicating that Mother and Father were involved in a physical altercation wherein Mother punched Father in the face. Both Mother and Father were subsequently granted protection from abuse (PFA) from the other. On July 14, 2021, the trial court granted the Agency's motion to suspend Father's visitation with Child due to the cross-PFAs filed by Mother and Father. On July 22, 2021, Father's supervised visitation was reinstated, but later modified on July 30, 2021, directing Father's visits with Child be supervised by an Agency approved person, instead of Maternal Grandparents, with visitation occurring at Blueprints Visitation House or other Agency approved location. On August 17, 2021, the trial court held a second permanency hearing wherein it determined that Father was again minimally compliant with the permanency plan and found Father made no progress toward alleviating the circumstances necessitating initial placement. The trial court held the third review hearing on December 14, 2021. The trial court again determined that Father was minimally compliant with the permanency plan in so far as he attended visitation sessions and obtaining housing. The trial court, however, noted that Father did not participate in alcohol and drug screenings and/or mental health treatment and there were ongoing domestic disputes when Mother and Father would encounter each other in passing coming to and from supervised visitation sessions with Child. The trial court also ordered the Agency to conduct a bonding assessment between Father and Child. On April 12, 2022, the trial court held the final review hearing and determined that Father was moderately compliant with the permanency plan.

Father completed batterer's intervention counseling, parenting classes, drug and alcohol treatment, and obtained stable housing. Father, however, did not receive or complete mental health treatment, was inconsistent with drug and alcohol testing, tested positive for marijuana and methadone, and failed to maintain consistent visitation with Child.

On February 1, 2022, the Agency filed a petition for involuntary termination of Father's parental rights. The trial court held three hearings on August 31, 2022, September 19, 2022, and October 5, 2022. On January 10, 2023, the trial court entered an order and opinion involuntarily terminating Father's rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8), and 2511(b). This timely appeal resulted.[3]

Father presents the following issues for our review:

1. Did the trial court commit an error of law in finding [the Agency] submitted clear and convincing evidence to terminate Fathers parental rights pursuant to 23 Pa.C.S.A. §[§] 2511(a)(1), (a)(2), (a)(5), and (a)(8)?

2. Did the trial court commit an abuse of discretion in considering unsubstantiated facts in support of its position, specifically, allegations of "potential domestic abuse" and findings that Father failed to comply with court ordered services pre-petition?

_____

[3] Father filed a notice of appeal on February 7, 2023. He failed, however, to include a corresponding concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Father corrected the error by filing an amended notice of appeal with the concomitant concise statement the following day, February 8, 2023. The trial court relied upon its earlier decision filed on January 10, 2023, as its rationale for the decision to involuntarily terminate Father's parental rights.

3. Did the trial court commit an abuse of discretion in failing to credit Father with pre[-]petition participation in [c]ourt [o]rdered services?

4. Did the trial court commit an error of law in requiring Father to effectively state on the record his desire for reunification, therein placing a legal burden upon the parent that is not explicitly or implicitly recognized by statute or caselaw?

Father's Brief at 4.

Our standard of review is well-settled:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Int. of H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super. 2023) (internal citation omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

In his first issue presented, Father argues that the trial court "failed to consider all of the court ordered services that Father either completed or

began prior to the initiation of the termination [] petition." *Id.* at 34; *see also id.* at 39 ("[I]t is undisputed that Father obtained adequate and suitable housing. He completed several services, including domestic violence classes as well as parenting."). However, Father also concedes that "the only services that remained [uncompleted] were mental health services and drug and alcohol services." *Id.* at 37; *see also id.* at 40 ("Father intermittently engaged in mental health services dating back to 2019."); *see also id.* at 42 ("Father initiated mental health services prior to the [Agency's termination] filing [although] he did not complete them."). Next, Father asserts that because he completed domestic violence counseling, the trial court erred in considering domestic violence as a factor in terminating Father's parental rights to Child. *Id.* at 41. Third, Father argues that the trial court erred by failing to credit his participation in mental health counseling and treatment before the Agency filed its termination petition. *Id.* at 42. Father claims that he initiated mental health services in 2019 but concedes he did not complete them. *Id.* Father re-engaged in services in 2022, had scheduling conflicts which prevented him from completing counseling before the termination petition was filed, but he ultimately resumed counseling and treatment after the petition was filed. *Id.* Finally, Father argues that the trial court engrafted an impermissible legal burden on him when it stated, "[the c]ourt looked for any statement of Father that he wished for reunification with his son or wished to care for his son and found none." *Id.* at 43, *citing* Trial Court Opinion, 1/10/2023, at 29 n.28.

Here, initially we note that the trial court carefully considered all of the court-ordered services Father completed prior to the filing of the termination petition. In fact, in its opinion, the trial court specifically noted that at the time the Agency filed its termination petition, Father completed some services, including batterer's intervention counseling, parenting education, drug and alcohol treatment, and maintained stable housing. *See* Trial Court Opinion, 1/10/2023, at 1 n.2, 2 n.3, and 8-9. However, despite completing drug and alcohol counseling, the trial court noted that Father later tested positive for marijuana and methadone, and routinely missed scheduled drug tests; therefore, the Agency could not confirm his sobriety. *Id.* at 17-19. While Father eventually completed batterer's intervention counseling on January 24, 2022, at the December 14, 2021 review hearing, "due to ongoing domestic violence concerns, which were amplified with Mother and Father seeing or running into each other before and/or after [supervised] visits [with Child], the [trial c]ourt directed that neither party could arrive or stay in the vicinity … for more than ten (10) minutes." *Id.* at 8. Thus, while participating in batterer's counseling, Father continued to engage in domestic disputes with Mother and, accordingly, it was proper for the trial court to consider. Furthermore, it is uncontested that Father was unsuccessfully discharged from initially implemented mental health services and had not completed counseling and treatment at the time of the termination hearing. *Id.* at 18-19. The trial court ultimately determined that "Father allowed others to provide for his Child's basic needs, while he provided excuses for his non-performance,

and inconsistent and/or absent compliance with services designed to support his ability to reunify." *Id.* at 37; *see also id.* at 40-41 ("Father's history supports periods of compliance, followed by periods of non-compliance and inconsistency [related] to Father's mental health, substance use, testing and treatment, and domestic violence history."). The trial court opined that Father "waited until [] Child was over a year old and developing a strong bond with Maternal Grandparents before addressing the lion's share of issues bringing J.D. into [the Agency's] care." *Id.* at 40. The trial court further found that "[w]hile Father waited to participate in services, succumbed to barriers for completion and by his own testimony, prioritized his marriage and employment over his relationship with [C]hild, [] Child was being care for by others." *Id.* Finally, regarding Father's argument that the trial court imposed an impermissible legal burden on him, the trial court merely noted that Father, by his own testimony, seemed more concerned with maintaining visitation, spending more time with Child, and fostering relationships with Father's family than actual reunification. *Id.* at 28-29. Moreover, the trial court noted that it looked for affirmation from Father that he wished for reunification, but clearly stated that "[w]hile not determinative of the outcome, [the trial c]ourt found the absence of a more direct request for reunification curious." *Id.* at 29 n.28. As such, we do not believe the trial court engrafted an impermissible burden upon Father at the termination hearing.

Based upon a review of the certified record, the parties' appellate briefs, the trial court's opinion, and applicable law, we find that the trial court

thoroughly and accurately addressed the merits of Father's appellate issues in its opinion. In its 48-page opinion, the trial court thoughtfully summarized the testimony of the 12 witnesses and the 26 exhibits presented at the termination hearings and carefully applied the evidence to each alleged subsection under 23 Pa.C.S.A. §§ 2511(a) and (b). Consequently, we affirm on the basis of the trial court opinion and adopt it as our own. The parties are instructed to attach a copy of the trial court's January 10, 2023 opinion to all future filings regarding this appeal.

     Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/12/2023

Received 5/12/2023 3:40:54 PM Supreme Court Western District

Filed 5/12/2023 3:40:00 PM Superior Court Western District
157 WDA 2023

*MaryAnn Hathaway.*

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
## ORPHAN'S COURT DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | ) |
| Adoption of: | ) |
| | ) |
| Judah Jacorey James Dungee | )    No. 63-22-0184 |
| a/k/a Judah Dungee | ) |
| | ) |
| DOB: 10/21/2020 | ) |
| A Minor Child. | ) |

## AMENDED OPINION and ORDER OF COURT

Before the Court is the Petition of the Washington County Children and Youth Social

Service Agency (hereinafter "the Agency") for the Involuntary Termination of Parental Rights of

Sean Dungee II (hereinafter "Father") to minor child, J.D. (hereinafter J.D. and/or "Child" and/or

"Minor Child").[1]

The Petition for Termination of Parental Rights (hereinafter "Petition" and/or "TPR")

was filed by the Agency on February 1, 2022, alleging multiple grounds under the Adoption Act

of 1980, Sections 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b). In support of the Petition, the

Agency alleges that Father has not complied with the Dependency Court permanency plan goals

and further alleges that he: (1) was not consistent with reoccurring mental health treatment and

was unsuccessfully discharged; (2) has not obtained and maintained safe and stable housing[2]; (3)

---

[1] Mother, Angela Dungee executed a voluntary termination of parental rights and consent to adoption at the outset of
the hearing. Following an oral colloquy in open court and acceptance as a voluntary, knowing and willful action,
the Court accepted the request and granted a voluntary termination of parental rights as to Mother.
[2] It is uncontested that as of the hearing date on the petition for Termination of Parental Rights, Father has obtained
safe and stable housing.

A-1

has not completed batterer's intervention[3]; and (4) based on a psychological evaluation, faces significant challenges with parenting with his current mental health diagnosis.

A hearing on the Agency's petition commenced on September 6, 2022, continued on September 19, 2022, and concluded on October 5, 2022. Prior to the hearing on the TPR Petition, Mother, Angela Dungee, requested, and the Agency consented to modify the Petition to a Voluntary Termination as to Mother. This action was completed on September 6, 2022.

A history of the dependency matter assists in the analysis of the Agency's request.

## Case Factual and Procedural History:

Minor Child, J.D. was born on October 21, 2020, to married parents Angela and Sean Dungee, both of whom are listed on the birth certificate. On January 4, 2021, the Minor Child was taken into care of the Agency through an Emergency Verbal Order granted in response to a report of safety concerns. The report set forth the following facts in support of the need for dependency:

- The child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental or emotional health, or morals; a determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or custodian that places the health, safety or welfare of the Child at risk, including evidence of the parent's, guardian or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the Child at risk."

---

[3] It is uncontested that as of the hearing date on the petition for Termination of Parental Rights, Father has completed batterer's intervention counseling.

In summary, J.D. was taken into custody due to lack of proper parental care or control, supported by concerns with Mother and Father's substance use, ongoing domestic violence concerns and lack of stable housing. The petition contained the following allegations:

o Mother and Father both have a criminal history and Father was incarcerated at the time of the dependency petition.

o Minor Child was taken to the hospital on January 2, 2021, for respiratory concerns. During the Child's assessment, Mother left the Minor Child at the hospital with a friend.

o It was reported that there was suspected domestic violence between Mother and Father and that their housing was unstable, which was confirmed by Mother.

o Mother reported to the Caseworker that there was ongoing domestic violence between herself and Father and that there was an incident as recently as six (6) days before the minor child was brought to the hospital. When asked, Father reported that Mother's mental health issues cause them to fight.

o Mother failed to have a plan to keep herself and the minor child safe and refused to go to a domestic violence shelter. Mother encouraged the Caseworker to call for a verbal order as "at least she would then know that her son was safe."

o Mother tested positive for marijuana, which she reported was prescribed, and benzodiazepines. She stated that she illegally purchased Xanax.

o Father left the hospital when asked to drug test.

o Mother and Father reported unstable housing.

With agreement of both parents, a Shelter Care petition was granted following hearing on January 4, 2021, wherein Minor Child was placed with maternal grandparents James and Jamie Chambers. The Court Order notes that "J.D. is diagnosed with laryngomalacia and tracheomalacia, having undergone two surgeries since birth." The Order states further, "Minor Child is followed by Children's Hospital ENT and Cardiology." At the Shelter proceeding, parents were granted supervised visitation, subject to then enacted COVID restrictions.

On January 15, 2021, Minor Child J.D. was adjudicated dependent with placement remaining with maternal grandparents. Through the adjudication Order, Father was to:

- Complete drug and alcohol testing twice monthly, upon random selection or reasonable suspicion of intoxication or impairment;[4]

- Complete drug & alcohol treatment and follow through with all recommendations;

- Complete mental health treatment and follow through with all recommendations;

- Obtain and maintain safe and stable housing;

- Complete batterer's intervention through an appropriate provider and follow through with all recommendations;

- Follow the rules and regulations of State Parole;

- Attend Parenting Education;

- Sign all releases requested by the Agency;

Father was permitted visitation with the minor child at the Blueprints Visitation House or other Agency approved location, supervised by James Chambers (maternal grandfather), three (3) times a week for two (2) hours each visit. No other friends or relatives were permitted to supervise visitation. Ordered visits contained the express condition that, Mr. Chambers may terminate a visit if it appears that Father is under the influence and/or behaves in a disruptive manner.[5]

By order dated, March 24, 2021, an Order for paternity testing was granted as to Father for purposes of confirming paternity of J.D..

---

[4] Noted that Father was also testing through federal pre-trial services. If he was called to be tested by two (2) or more agencies for random testing within a twenty-four (24) hour period, Father was permitted to present written proof of negative results to the Agency in lieu of re-testing.

[5] As a result of acceptance of Mother's voluntary, this Opinion will not review Court ordered services for Mother.

A permanency review hearing was held via TEAMS on Tuesday, May 4, 2021, and both Father and his attorney attended. Father was found to be minimally compliant with the permanency plan and to have made minimal progress toward alleviating the circumstances which necessitated the original placement. Specifically, Father had completed a drug and alcohol evaluation and no further treatment was recommended.[6] He was also actively engaged in Batterer's Intervention Counseling and Blueprints parenting education. It was reported that Father had strong initial participation which became spotty as the review period went on. Additionally, Father reported that his participation decline was resultant of a car accident and destruction of his cellphone used for telehealth. Interestingly enough, Maternal Grandfather reported that the accident occurred when Father was driving without a license. There was also an incident during this review period where a potential domestic incident between Mother and Father resulted in police being called. The Minor Child was reported to be doing well in the kinship caregivers' home. Father's court ordered services remained the same as the initial permanency order.

On May 11, 2021, the Agency reported through filed status report that they were notified that Father, Sean Dungee and Mother, Angela (Chambers) Dungee, were involved in a physical domestic incident. The Agency spoke with State Trooper Samuael Apke who reported to a verbal domestic occurring in a parking lot down the street from the home of Father and Mother. Said status report indicated that during the incident Mother, Angela Chambers Dungee punched Father, Sean Dungee, in the face.

---

[6] Despite such recommendation, the Dependency Court continued to order drug and alcohol treatment.

On May 12, 2021 a protection from abuse temporary order was granted on behalf of Angela Dungee against Sean Dungee.[7]

On July 14, 2021, a motion to suspend visitation was filed by the Agency and signed by this Court. The Motion was filed as a result of the caregivers and maternal grandparents requesting to no longer supervise visitation between Father and the Minor Child due to Protection from Abuse Orders cross-filed by Mother and Father and naming one another as defendants. Visits were then scheduled between Father and child at a visit facility. Father failed to confirm four (4) visits at the visit facility. Upon motion of the Agency, visits were suspended pending confirmation of paternity. By order of July 22, 2021, this request was withdrawn and visitation for Father was reinstated.

On July 26, 2021, the Agency filed another Motion to decrease Father's visitation based on Father's failure to confirm visits and continued concerns with domestic violence. The Motion of the Agency to decrease visitation included the following allegations:

- Mr. James and Ms. Jaime Chambers do not feel comfortable supervising visits, as there are current Protection from Abuse Orders between Mr. and Mrs. Dungee that have been granted until September, 2022. A visitation referral was completed and Agency caseworkers were supervising visits until Blueprints had staff available to accommodate Mr. Dungee's schedule.
- On July 7, 2021, Mr. Dungee did not confirm his fourth consecutive scheduled visit. The Agency caseworker, Ms. Eisengart, was unable to contact Mr. Dungee.
- In addition, there continues to be domestic violence concerns. The most recent allegation arises at MJ-27201-CR-0000185-2021 Commonwealth of Pennsylvania vs. Sean L. Dungee II (Filed 7/15/2021). The Affidavit of Probable Cause states, inter. Alia. "Angela Dungee stated that she was in the passenger seat of Toi Burgess's vehicle when Sean L. Dungee approached her on foot and struck her in the face with a closed fist, spit upon her person, and sprayed her with pepper spray." The Affidavit goes

---

[7] Order was later modified to include Minor Child but record is absent reference to when such modification was completed. Later orders also indicate that protection from abuse orders were filed on Father, Sean Dungee's behalf and against Mother, Angela Dungee. In other words, both parties were granted protection orders against the other.

on to allege "Angela Dungee was being treated for the effects of the pepper spray and Officer O'Rourke and I did observe Angela Dungee's face and hands to be red and irritated. Two witnesses did observe this incident and corroborated Angela Dungee's recollection of the events." The docket indicates that Sean L. Dungee II was charged with simple assault and harassment.

*See status report with attached police criminal complaint accepted with dependency record at CYS Exhibit 5.*

By order dated July 30, 2021, Father's visitation was modified to supervised visitation at the Blueprints Visitation House, or other Agency approved location, supervised by an Agency approved person, one time a week for two hours in duration, with permission to expand after Father participated in three consecutive visits.

The next permanency review hearing was held before this Court on August 17, 2021. Father was determined to have minimal compliance and to have made no progress toward alleviating the circumstances which necessitated the initial placement. Father was granted visitation at an Agency-approved location, supervised by an Agency approved person, one (1) time per week for two (2) hours with permission to expand if Father participated in three (3) consecutive visits. Father's Court Ordered services remained the same except for the additional requirement directing Father to follow the recommendation of Dr. Crabtree's evaluation. At the time of the August 2021 hearing, the Minor Child was in placement for seven (7) months and continued to be placed with Maternal Grandparents.

The Minor Child was in placement for eleven (11) months at the time of the next permanency review hearing, on December 14, 2021. Father was found to have minimal compliance with the permanency plan, as a result of attending visitation and obtaining housing. However, it was

specifically noted that Father had not appeared for drug and alcohol screenings or mental health treatment. Father was found to have no progress. Father's visitation remained the same, however, due to ongoing domestic violence concerns, which were amplified with Mother and Father seeing or running into one another before and/or after visits, the Court directed that neither party could arrive or stay in the vicinity of the building, including the building itself, outside perimeter and parking lot, for more than ten (10) minutes. Father's ordered services stayed the same, but he was also ordered to participate in a Bonding Assessment, as arranged by the Agency. CYS was ordered to assist both parents with transportation, upon request and advance notice from parents. Both parents were also ordered to engage in TPR and PACA Counseling.[8]

On the 12th of April 2022, the final permanency review hearing before the TPR hearing was held. Father was found to be in moderate compliance with the permanency plan and to have made minimal progress toward alleviating the circumstances which necessitated the initial placement. At the time of the hearing, the Agency had filed the petition to terminate parental rights with an original hearing date of June 2, 2022.

Testimony at the hearing included information that Father completed batterer's intervention counseling on January 24, 2022,[9] had earlier completed parenting education on June 22, 2021,

---

[8] The specific order for Termination of Parental Rights and Post Adoption Contact counseling is insightful because it appears in the record, parents were on notice that the Agency and Court had begun focus on the concurrent permanency goal of adoption.

[9] As admitted as CYS Exhibit 11, Ms. Vozar writes:

> Please be advised that Mr. Dungee completed the PA Professional Health Services BIP program. He has positive attendance and participation and demonstrated no issues or concerns. It is recommended Mr. Dungee continue follow up with CYS as well as refer to a mental health or substance abuse counselor should it become necessary. *Letter of January 24, 2022.*

and completed drug and alcohol treatment.[10] Father was compliant with parole and maintained safe and stable housing. No information was presented regarding Father's mental health treatment. The Court Order from the April 12th hearing kept Father's court ordered services the same and requested updated evaluations and TPR and Post Adoption Counseling for Father.

Dr. Michael Crabtree testified at the hearing regarding interactions he witnessed between Father and the Minor Child and stated that while the Minor Child seems bonded to Father, his primary attachment is with maternal grandparents. Dr. Crabtree stated that **increased visitation with Father would not negatively impact the child, so long as this visitation did not impact his bond with maternal grandparents.** Father was permitted visitation with the Minor Child one (1) time per week for two (2) hours at an Agency approved location supervised by an Agency approved person. He was also permitted to have three (3) additional visits per month for three (3) hours each, as could be arranged and supervised by the Agency.

<u>Testimony provided at Termination of Parental Rights hearings</u>:

This Court conducted a hearing on the TPR Petition that involved three (3) full days of testimony from eleven (11) witnesses as summarized herein. Additionally, at the

---

[10] See letter of March 23, 2022 from Allied Addiction Recovery (AAR) indicating that Sean Dungee is currently enrolled in treatment with an intake appointment on February 3, 2022 with a recommendation of weekly outpatient group therapy. The letter continues:

> He attends weekly evening appointments without attendance issues. Sean attended group therapy of 2/9, 2/16, 2/23, 3/2, 3/9, and 3/16/22. He has remained engaged with treatment and in compliance with the program. Sean provided appropriate urinalysis profiles weekly, with no evidence of relapse or illicit substance use. He expresses understanding of the harmful effects of substance use for families and communities. At this time, Sean has made positive progress in treatment. *Letter of March 3, 2022.*

A second AAR letter was also submitted dated June 22, 2022, indicating:

> This letter is being written to verify that Sean Dungee is currently enrolled in treatment at Allied Addiction Recovery, LLC. He attended an intake appointment on 2/7/22 and was recommended to participate in weekly outpatient group therapy sessions. Sean has attended a total of 13 group therapy sessions in addition to three individual therapy sessions and his intake assessment. His attendance and participation in treatment have been good. Sean has made positive progress in treatment. He provided weekly urine samples, and all results of his urinalysis testing were appropriate. Sean is scheduled to successfully complete treatment on 6/27/22 following his final individual therapy appointment as long as he maintains his current status and compliance with treatment. *Letter of June 22, 2022.*

conclusion of the hearing, counsel for Father, the Agency Solicitor, and child counsel provided findings of fact and conclusions of law.

The first hearing date was August 31, 2022. At the commencement of the hearing, Mother, Angela Dungee, requested with consent of all parties, to amend the termination petition filed against her to a voluntary agreement. Following oral colloquy and submission of an Agreement to Terminate and Submission of an Oral Colloquy, Mother's request was granted.

1) <u>Kathryn Davis, Pre-licensed Marriage & Family therapist</u>:

Testimony was received via telephone from Kathryn Davis of Christian Counseling Associates. Davis testified that she is a "Pre-licensed" marriage and family therapist who is currently under the supervision of another person. Davis testified that Father, Sean Dungee, has been her client as of January 31, 2022. Notably, this is over one (1) year after Dungee was originally ordered to complete such service.[11] This statement is also inconsistent with Davis's later testimony that her **"initial assessment" of Dungee was on February 7, 2022.**[12] According to Davis, she engaged in weekly on-line therapy sessions with Father for, "adjustment disorder, anxiety and depression." Ms. Davis indicated her treatment plan was based on information self-reported by Father and further indicated that she was unaware of the evaluation conducted with Dr. Crabtree and his and/or specific court recommendations for Father.

Davis indicated that her initial assessment with Father was on February 7, 2022 with the presenting problem provided by Father as Anxiety, PTSD, and Bi-Polar disorder. Father

---

[11] Davis indicated that she graduated with a master's degree and is under supervision of a licensed therapist, which is required for a specific number of hours prior to being licensed.

[12] The dates provided by Davis are important in this Court's consideration of whether Dungee's initial participation occurred pre and/or post TPR petition filing. It appears that Davis carefully utilized the date of January 31, 2022 in stating that is when Dungee became her client, however, by her own testimony, her initial assessment was not until two (2) weeks later and following the filing of the TPR petition. .

indicated to Davis that his anxiety and depression were related to legal and parenting issues. Father's last session with Davis occurred on May 18, 2022. When asked why Father was no longer a client, Davis indicated that continuing therapy is her "client's prerogative" and Father chose to be discharged. Davis continued that when Father attended therapy with her, he did so regularly and consistently.

Davis provided additional details when questioned by Father's counsel. Davis continued that Father was cooperative in sessions and noted that she found him "open and honest." Davis said that Father made progress in increasing his "self worth and with managing anxiety." She testified further that Father "progressed in a positive way and was receptive to the on-line therapy," successfully moving through long and short term goals. When asked for further detail, Davis testified that Father progressed with her assessment tool in his anxiety, starting at an 11 and ending with a 1. A similar tool used by Davis regarding Father's depression showed an improvement from a 10 at the beginning to a 1.[13] Father was discharged as a result of his completion of long and short term goals, however, Davis indicated that his goals and her conclusions were based entirely on the information that Father provided. Davis acknowledged that her treatment plan would be different if she had been provided the report of Dr. Crabtree or was presented at the assessment with concerns of agoraphobia and/or cannabis disorder. Davis acknowledged she does not treat PTSD, cannabis use disorder, alcohol problems, bi-polar and/or agoraphobia.[14] Additionally, Davis acknowledged awareness of Father's treatment with Southwestern Pennsylvania Human Services (SPHS), but did not request, receive, and/or review information and/or records from the provider.

---

[13] Davis referred to a report, however a report was not introduced at the hearing and is not of record.
[14] All of which are included in Father's mental health history as discussed herein.

Davis had no contact with the Agency during her treatment of Father. She testified that in July of this year, after her closure of Dungee's case, she had contact with Caseworker Paige Eisengart approximately one (1) or two (2) times. Davis also indicated that she received a signed release of information in June of 2022 and a report was sent to the Agency at the beginning of August.

2) Dr. Michael Crabtree- Expert in Forensic Psychology

After being qualified by consent as an expert in forensic psychology, Dr. Crabtree provided testimony regarding his various evaluations with Dungee. Dr. Crabtree's initial evaluation and assessment of Dungee occurred on May 18, 2021. Following a battery of tests and assessments, Crabtree identified anxiety, paranoia, panic, cannabis and alcohol disorder with Dungee. His report of May 18, 2021 entered as Exhibit 6 collective, notes a diagnosis of Cannabis Use Disorder Mild, Alcohol Use Disorder Moderate, Generalized Anxiety Disorder and Agoraphobia with Panic Disorder. *See Report at Pg. 9.* Crabtree indicated that the anxiety and panic would be responsive to treatment, but thought the cannabis and alcohol findings would have a significant impact on Father's ability to parent. **Crabtree recommended that Father continue ongoing therapy and treatment through SPHS** *with mental health and drug and alcohol services.*[15]

---

[15] Crabtree noted frustration in not having access to the records of Christian Counseling. Crabtree was present for the testimony of pre-licensed therapist Davis.

Crabtree's report indicates the following:

... of great interest regarding the test results is the fact that Mr. Dungee has some difficulty thinking through situations and arriving at rational conclusions (a so-called Thought Disorder). He also experiences significant social detachment from others and has a high level of paranoia being hypervigilant and feeling he is always being

Crabtree testified that he made multiple attempts to obtain the records of Christian Counseling Services and failed. Crabtree opined that the therapy that Father received from Christian Counseling was insufficient and failed to comply with his recommendations. Crabtree noted further concerns that the counseling did not address the areas of concern that his assessment found most significant.

Dr. Crabtree next completed an interactional evaluation between the Minor Child and Father on January 21, 2022, this evaluation was provided by report dated February 23, 2022. This report, also part of collective Exhibit 6 indicates in conclusion, "Father showed good parenting skills as he worked with his son. The conclusion is that there is a bonded relationship between the father and son." *Page 5 of report.* No testimony was presented regarding the January evaluation.

Dr. Crabtree completed an updated evaluation with Father on June 14, 2022. Through the report dated June 23, 2022, Dr. Crabtree states the following in conclusions and recommendations:

> Since the evaluator last met with Mr. Dungee, he has continued to lead a responsible life. He has changed employers, and he reports himself to be getting

persecuted and having a high degree of resentment. *The test results combined with his existing mental health diagnosis at SPHS, The Care Center suggest a significant challenge for his ability to effectively parent.*

It is recommended that he be required to attend at the rate suggested by SPHS, The Care Center for mental health services and that he have substance abuse treatment services in addition.

Mr. Dungee does not appear to have been actively involved in the parenting of his older children. The three mothers of these four children have taken primary responsibility for raising the children. Therefore, he may need instruction in parenting skills to provide effective care for his son.

Of great concern for the Agency in putting together a long-term plan for Mr. Dungee's involvement with his son is not only his criminal history but also potential future incarceration. His criminal history is listed above on page 9 of this report. It is the evaluator's understanding that when the most recent charges are adjudicated, he may be serving a very long sentence in a state or federal prison (Note of Opinion-It is noted that Mr. Dungee was sentenced to time served with probation) It would be important for the needs of the child that there be some understanding of whether Mr. Dungee would be physically present over the next few years of the child's life before a great deal of effort is extended to be certain that the bond between himself and the child is established or maintained.

along well with fellow workers and supervisors. He has not gotten into any legal trouble. He reports he has followed through with the counseling recommendations made by CYS.

Mr. Dungee presented as very pleasant, engaged and sincere.

**He has a desire to be involved in his son's life.** It should be noted Mr. Dungee has four other children, all of whom are in custody with their mothers, and of whom Mr. Dungee does not have custody.

Mr. Dungee has a strong desire to see his son involved in his own extended family. It was implied during conversation with Mr. Dungee that **even if he is not the primary physical custodian, he would like to have some time with his son so that his son could continue to develop a relationship with him, and get to know his extended family.**

There are no mental health, drug and alcohol, or lifestyle issues that were discovered by this re-evaluation. An area for which there was not good confirming information is the legal issues still facing Mr. Dungee. He reports he has not had clear information on whether he will have to spend time in a state prison because of pending legal issues; he reports it is possible he might get probation instead.

Mr. Dungee's parenting test scores support the fact he has values and attitudes consistent with a good parent.

*See Report dated June 28, 2022, pgs. 7-8.*

Through a report dated on same date, Dr. Crabtree did a bonding assessment with his Maternal Grandparents and placement providers wherein he found that the Minor Child had a bonded relationship with grandfather and grandfather's wife. A bonding assessment was also done with Father, to which testimony was received and a report was provided, dated June 23, 2022. The conclusions and recommendations of the written report indicate the following:

This is the second opportunity the evaluator has to observe Sean L. Dungee II along with his son, J.D.. This most recent observation indicates a more natural quality as the father and child interacted with one another. **There is a bond between them. The father was able to demonstrate a number of strong parenting skills, at least as they relate to emotional bonding with his child** (it is difficult to determine if he has a good foundation in understanding the needs the child might have for meeting developmental milestones). The child was very natural and comfortable with the father. The child never showed any anxiety in

the presence of his father. The father could initiate emotional connection with the child, and reciprocate when it appeared as though the child was in need of some emotional reassurance. The father was able to interact appropriately and comfortably with grandfather of the child, who presently has custody.

Therefore, to answer the referral questions from the agency, **there is a bond between J.D. and his maternal grandparents, and there is a bond between J.D. and his father. That being said, this evaluator concludes that the child would not suffer if the bond between the child and the father were to be severed and the child continued to live with his maternal grandparents.**

This conclusion is based on the fact that the bond that exists between the child and the grandparents is strong and would, from all indications, continue to be strong.

**Father presents with a sincere interest in maintaining a relationship with his son. On the other hand, it is not clear that he has enough knowledge about issues related to child development, and to specific needs his child has, to be the primary caregiver for the child. Mr. Dungee has had five children and he has not been involved in raising the older children.**

All the above is given with a reasonable degree of psychological certainty.

*See Report dated June 23, 2022, pg. 5.*

In support of his opinions, Dr. Crabtree testified **that Father had an "identifiable bond" with the Minor Child and was appropriate in approaching his son, who was "comfortable with Father."** Crabtree felt that there was a "good degree of cooperation" between Maternal Grandfather and Father. Crabtree continued to opine that **the bonded relationship between Father and the Minor Child was largely attributable to the action of Maternal Grandfather.** He testified that during his first meeting with Father, he observed no bond between the Father and Minor child. Nevertheless, a year later, the Grandfather "allowed for a relationship" which supported a development of a bond between the Child and Father.

Crabtree testified that the Minor Childs primary caregivers are his Grandparents who have served in that capacity for approximately eighteen (18) months. Crabtree testified that he has "no concerns with Grandparent's parenting of J.D. and testified further that, "Thanks to the

Grandparents, the Minor Child has a secure bond that should not be disturbed. Crabtree testified that the Minor Child's best interests are best served if he is in the continuous care of the Grandparents. Stating further, Father as the primary caregiver is not in the best interest of the child. Next, Crabtree noted his forefront considerations in developing his opinion, including: 1) asking whether Father still suffers from substance abuse issues; 2) questioning the fact that Father has four (4) other children for which he hasn't been an active parent; 3) noting the Minor Child's relationship with Father was tenuous prior to Maternal Grandfather being involved; and 4) questioning the impact of Father's pending federal criminal sentencing. In conclusion on direct, Dr. Crabtree testified that it could be "deleterious to the Child" to separate him from Grandparents, whereas he "does not believe the Child would suffer psychological harm if a termination of parental rights was granted as to Father because the Child's "primary bond is with Grandparents.

On cross examination, Dr. Crabtree was presented with reports of Father's recent drug testing and treatment. Crabtree responded that he saw the reports as showing that Father, "is addressing his abuse with fewer failed tests which shows an upward trajectory, however the results do not establish that Father is ready to live clean and sober. In addition, Crabtree noted concern with having no results for Father's alcohol testing.

Crabtree reported that his conclusions regarding Father's interaction with his other children (Father not primary custodian and not involved in the rearing of) were based on information provided by Father. He also declined to agree that a parental bond is a "preferred bond" when questioned. Crabtree testified that a child can and does develop a bond with a consistent caregiver and restated that Minor Child has a primary bond that is consistent and predictable with Grandparents. In response to additional questions regarding the issues leading

to dependency adjudication, Crabtree noted that, Father's substance abuse issues were not resolved despite adequate time to address the issues. Crabtree testified that with "a parent facing the loss of a Child the concerns of the Agency should be paramount." Based on his diagnosis at the first assessment, wherein two (2) concerns were substance abuse related, Crabtree opined that based on information from Father's service providers, Father is inconsistent with addressing these concerns.

Upon further examination from the GAL, Crabtree testified to concerns with anxiety being the focus of treatment sought by Father. Crabtree noted that there was no treatment for PTSD and no treatment reports specific to Father. Crabtree further pointed to Father's missed testing in both 2021 and 2022.

### 3) Paige Eisengart- Washington County Children and Youth Caseworker

Paige Eisengart, ongoing Caseworker for J.D. next provided testimony. Eisengart gave an overview of the Agency involvement with J.D.'s family and the concerns resulting in Child's adjudication of dependency. Per Ms. Eisengart, the Minor Child was adjudicated dependent on January 15, 2021. Accordingly, at the time of Ms. Eisengart's testimony, the Minor Child was adjudicated and out of care of Father for over nineteen (19) months. The Agency filed the Petition for Termination of Parental Rights in February of 2022, thirteen (13) months following the initial adjudication.

Ms. Eisengart testified that Father participated with court ordered drug testing sporadically throughout the dependency matter. Father completed forty-one (41) of seventy-nine (79) random tests. In six (6) tests, he was positive for cannabinoids and two (2), testing positive for methadone.[16] Father was a no-show for thirty-eight (38) of the seventy-nine (79) tests and

[16]One such test with a positive screening for methadone was challenged by Father and later determined to be a false positive. Father only challenged the methadone finding and not the companion positive screen for cannabinoids.

twenty-seven (27) of the tests occurred after the TPR Petition was filed.[17] According to the testimony of Ms. Eisengart, Father was compliant with drug and alcohol treatment, successfully completing AAR treatment.[18] Father was unsuccessfully discharged from mental health counseling with provider SPHS, but later completed treatment with Christian Counseling Services. Father completed Batterer's Counseling in January of 2022 and parenting education in June of 2021. Eisengart testified that Father was compliant with providing the Agency releases

---

[17] Father has tested positive for cannabinoids after the completion of the drug & alcohol treatment and the Agency cannot confirm his sobriety due to the positive drug screens and those tests missed by Father.

[18] Treatment completed June 27, 2022. Letters submitted as evidence of Father's completion of treatment at Allied Addiction Recovery, AAR, read as follows:

> This letter is being written to verify that Sean Dungee is currently enrolled in treatment at Allied Addiction Recovery, LLC. He attended an intake appointment on 2/7/22 and was recommended to participate in weekly outpatient group therapy sessions from 6-7:30 pm. He attends weekly evening appointments without attendance issues. Sean attended group therapy on 2/9, 2/16, 2/23, 3/2, 3/9, and 3/16/22. He has remained engaged with treatment and in compliance with the program. Sean provided appropriate urinalysis profiles weekly, with no evidence of relapse or illicit substance use. He expresses understanding of the harmful effects of substance use for families and communities. At this time, Sean has made positive progress in treatment. Signed Halee V. Stroup, BA, Counselor. *See Letter of March 23, 2022, CYS Exhibit 14.*

> This letter is being written to verify that Sean Dungee is currently enrolled in treatment at Allied Addiction Recovery, LLC. He attended an intake appointment on 2/7/22 and was recommended to participate in weekly outpatient group therapy sessions. Sean has attended a total of 13 group therapy sessions in addition to three individual therapy sessions and his intake assessment. His attendance and participation in treatment have been good. Sean has made positive progress in treatment. He provided weekly urine samples, and all results of his urinalysis testing were appropriate. Sean is scheduled to successfully complete treatment on 6/27/22 following his final individual therapy appointment as long as he maintains his current status and compliance with treatment. Signed Haelee V. Stroup, BA, Counselor. *See Letter of June 22, 2022, CYS Exhibit 14.*

> This letter is being written to verify that Sean Dungee successfully completed treatment at Allied Addiction Recovery, LLC. He attended an intake appointment on 2/7/22 and was recommended to participate in weekly outpatient group therapy sessions. Sean attended a total of 13 group therapy sessions in addition to five individual therapy sessions and his intake assessment. His attendance and participation in treatment were good. Sean made positive progress in treatment. He provided weekly urine samples, and all results of his urinalysis testing were appropriate. Please feel free to let me know if there are any questions or concerns. *See Letter of June 27, 2022, Father's Exhibit B.*

and equally compliant with parole. Finally, Eisengart testified that Father maintained safe and stable housing.

Despite Father's compliance with most court ordered services, Eisengart testified that there were a number of Agency concerns remaining. First, Eisengart testified that, despite Father completing counseling with Christian Counseling, the Agency remained concerned with the effectiveness of such treatment due to the lack of collateral information provided to the counselor. Eisengart testified that she was unable to verify Father's present sobriety due to his no shows at drug screens. Eisengart also testified that there are continued concerns regarding Father's mental health. Finally, Eisengart testified that despite Father completing Batterer's Intervention, his participation occurred at the same time as the TPR filing.[19] Upon direct questioning of what circumstances are not remedied from the original adjudication, Eisengart testified, Father's mental health, sobriety and his outstanding criminal case.

Eisengart acknowledged that Father's visits with J.D. "go well," while also testifying that Father has never reached the level of unsupervised visits. Currently, Father has Court ordered supervised visitation, once a week for three (3) hours, along with three (3) additional visits every month. Father has not spent time with J.D. unsupervised since the inception of the case. The Caseworker reported that the visits go well. However, since additional visits were ordered in June of 2022, Father has failed to utilize the additional visits.

---

[19] TPR was filed approximately one (1) year after the child was adjudicated dependent. The Agency filed the TPR before the standard timeline of fifteen (15) months, utilized by the Washington County Agency. When asked why the Agency filed the Petition early, the Caseworker indicated that the parents were not compliant with services and were not drug testing.

As supported by the Dependency Court docket, Eisengart testified that Father's highest level of compliance with his permanency plan was moderate in April of 2022 with his highest level of progress being minimal at the same time.

J.D. has been placed with Maternal Grandparents since January 2021. Caseworker has visited the kinship home including as recently as August of 2022. Caseworker stated that J.D. appears to be happy and doing well in the home. He also receives early intervention services in the home of the Chambers. J.D. previously received occupational therapy, but has since discharged. Maternal Grandparents ensure that J.D. attends all services, meet J.D.'s daily needs, and act as a pre-adoptive placement. J.D. refers to Maternal Grandparents, with whom he has been in care for the majority of his life, as "Mom and Dad."[20] Eisengart stated that the Agency has provided services for Father to assist him in alleviating the circumstances that brought J.D. into care. Eisengart testified that J.D. has been in care for the majority of his life and deserves permanency.

On cross, Eisengart was questioned regarding the false positive drug screen of Father and whether the Agency had concerns with the reliability of the other tests, to which Eisengart responded in the negative. Eisengart was also asked about the child permanency plan (CPP), which indicated that mental health treatment was completed.

Testimony of Eisengart on cross-examination included testimony that she was in contact with another child of Father, Kylea, who was unable to be a placement resource due to her age. Eisengart was unable to speak to any other members of Father's family, but noted that Father failed to offer any family members for placement prior to the filing of the TPR. Finally, Eisengart testified that she was unaware of Father's potential sentence for his outstanding

---

[20] The Minor Child turned two (2) in October and came into care at two and one-half (2 ½) months old.

criminal charges but would have concerns for even house-arrest due to Father's inability to handle emergencies or attend appointments for the Minor Child.

Eisengart testified that Father was cooperative with signing releases and completed Triple P Parenting in June of 2021 and Batterers Intervention Counseling in January of 2022.

When questioned in more detail about Father's visits with the Minor Child, Eisengart stated that Father has had some valid excuses for missing visits including, contact with COVID, a funeral, car problems and work. Eisengart noted that she has observed a few minutes of a few visits between Father and J.D., and also supervised visits a couple of times at Blueprints. Eisengart indicated that the interaction between Father and Child is positive and she has no concerns during the visits. Eisengart also testified that there has been no historical threat or threat of harm to J.D. with Father.

Upon questioning from the GAL, Eisengart acknowledged that Father may not be getting everything he needs from the services he has engaged with, specifically considering his progress reflected in Court orders. The Caseworker agreed it was concerning, when questioned about the timing of Father's highest level of progress being followed, a short ten (10) days later, by the entry of a protection from abuse order. Eisengart also acknowledged that Father was involved with the Agency for other children, but noted that the other case was closed.

With specific reference to the needs of J.D., Eisengart testified that the child has health conditions, including asthma and Father has not attended any appointments for child.[21]

4) <u>Anne Schlegel Director Washington County Children and Youth Social Services</u>

Director Schegel testified that an Agency team meeting was conducted to discuss the Dungee

---

[21] Testimony indicates that Father sent a message via text to Foster Parents asking how the Minor Child was doing. It was also noted that Father was offered additional visits but failed to utilize the same. In addition, Maternal Step-grandmother took a year off from working to care for the Minor Child's specialized medical needs.

case during Caseworker Eisengart's maternity leave. The meeting, called by Casework Supervisor, Kristin Young, was facilitated by Schlegel. The meeting first involved a review of services provided to Father. The team contemplated that, at the time of the meeting, Father had not done batterers' intervention, had a pending PFA violation, had engaged in mental health treatment but not completed the same, had an ongoing history of domestic violence and found to have no progress in alleviating concerns leading to the Child's dependency. In short, Schlegel indicated that the meeting was held when the Minor Child was twelve (12) months in care and the Agency opinioned that they offered Father all available court services, with no other reasonable services available and no significant progress from Father.

### 5) Kylea Dungee-

Dungee's twenty (20) year old adult child provided testimony at the hearing. Appearing quite nervous, Kylea Dungee testified that she currently lives alone in Donora and J.D. is her brother that she met as a newborn and last saw in Christmas of 2020. Kylea testified that when she saw J.D. at her great grandmother, Ms. Donna's house, she watched Dungee feed J.D., provide a diaper change, and engage in other "newborn stuff" with the Minor Child. Kylea indicated that J.D. was two (2) months old at the time. The witness indicated that she "had J.D. a lot during the Christmas visit," further indicating, "I held him a lot… the whole time." Kylea testified that she also saw J.D. on another visit when he was a couple days or a week old. She indicated that she hasn't seen the baby since, "because the baby is with Jamie and Jim."[22] Kylea indicated that she contacted the Caseworker Paige Eisengart to offer herself as a caregiver for J.D.. In July 2021, Kylea contacted the Agency to hold herself out as a placement option for J.D.

---

[22] The witness indicated that she attempted to contact Jamie and Jim with a Facebook request, "but it didn't go through."

The Minor Child, who was approximately four (4) or five (5) months at the time, was unable to be placed with Kylea due to Kylea's age. Kylea indicated that she made an additional call to the Agency, but did not receive a return call. A second call was made to the Agency with the assistance of a daycare owner with whom Kylea was familiar in August of 2021.[23] The Caseworker informed Kylea that she would discuss her requests with her supervisor, however, Kylea never heard back from the Agency. While Kylea requested placement of J.D. in her care, she didn't request visitation with the Minor Child.

In addition to her in person observations, Kylea was able to observe Dungee with J.D. on face-time calls during his visits in late 2021. Dungee would call her when he was with the Minor Child and she would observe Father feed J.D. snacks. Kylea indicated that "KyKy" was the nickname J.D. used for her. Kylea also testified that she gave gifts to J.D. for his birthday and Christmas, which were delivered through Dungee.[24]

### 6) Donna Ebore- Grandmother of Dungee, Great-Grandmother of J.D.

Testimony was received from Donna Ebore, Paternal Great-Grandmother. Ms. Ebore testified that Dungee resided in her home three (3) months before J.D. was born and three (3) months thereafter. J.D. and Dungee resided in her home "from the "first day home from the hospital, until CYS took him and placed him with Mr. Chambers." Ebore, who is retired, testified that J.D., "wasn't a bad baby" or a baby that would "cry a lot" and she watched Dungee feed, clothe and bathe the Minor Child. Ebore indicated that both she and Dungee provided gifts

---

[23] Later testimony indicated that it was "Ms. Sonya's daycare" called "Sonya's Enchanted Garden," and located in Donora, PA.
-It is unclear if two (2) or three (3) calls were made to the Agency. On cross-examination from the GAL, Kylea indicated that the first call was when she was living her first month on her own and wanted to "help with the situation." The second call was with Ms. Sonya's daycare owner, when she worked there.
[24] Kylea testified that she provided CROCs and clothing for J.D..

for J.D.. According to Ebore, Dungee has "been through this before," (referring to his four (4) other children) and she has no safety concerns with J.D. in Dungee's care. Ebore stated that, three (3) weeks ago, she observed Dungee with J.D. on Facebook, something she would do about one (1) time per week. During this Facebook observation, Ebore would observe Dungee hold J.D.. The Facebook video was recorded and not a live feed. Ebore's last live interaction with J.D. was when he was three (3) months old. Ebore testified that she never reached out to the Agency to care for J.D., but directly made requests to the placement providers to care for J.D.. No visits ever occurred and Ebore only made one (1) attempt to contact the Chambers family. Ebore indicated that she is "disabled" and "cannot do a lot" only able to hold J.D. for a "limited time." In response to questions from the Court, Ebore indicated that her husband is not "able bodied" and she has a caregiver, Toi Burgess, her daughter[25]. In response to additional questions, Ebore indicated that Dungee was not subject to a PFA when he was living in her home and also was not subject to federal drug charges at the time. On cross-examination by the GAL, Ebore clarified that the federal drug charges were filed against Dungee "way before" he lived in her home.

### 7) Carly Sonafelt-Cuseard- Case Aid for Washington County CYS

Carly Sonafelt-Cuseard, Case Aid for the Agency, provided testimony beginning with her history of providing services to Dungee in June or July of 2021. Sonalfelt-Cuseard indicated that she supervised visits for Dungee and J.D. and found the visits appropriate. She indicated that Dungee always checks J.D.'s diaper and feeds and plays with the Minor Child. Sonafelt-Cuseard indicated that Dungee is able to calm J.D. down and pays appropriate attention to the Child. She

---

[25] Cross reference with page 25 herein in description of domestic violence incident in the presence of Toi Burgess.

also testified that Dungee provides birthday and Christmas gifts and clothes, toys and trucks for the Minor Child for "special events." Sonafelt-Cuseard observed that Father is up-to-date on the Minor Child's medicals and has watched him maintain regular contact with the Chambers.

Overall, Sonafelt-Cuseard testified that she has observed no problems during the visits between Dungee and J.D. and has observed video calls between Dungee and Kylea during visits. On cross-examination from the GAL, Sonafelt-Cuseard testified that Dungee started bringing supplies to the visit with J.D. one (1) or two (2) months ago and previously Jaime Chambers, foster mother, provided all supplies. Sonafelt-Cuseard also testified that the video calls with Kylea have only happened more recently.

8) Sean Dungee

Sean Dungee, Father, provided testimony on his own behalf. After providing some basic information, Dungee began to address his present living conditions and his response and compliance with the Dependency Case Court ordered services. Dungee testified that he lives alone in a two (2) bedroom home with room for J.D. The Agency has deemed Dungee's home appropriate with no concerns as of August 2022. Dungee indicated that he is aware of his Court ordered services, including the requirement for random drug and alcohol testing. Dungee indicated that he works Monday through Friday from seven (7) am until three (3) pm daily.[26] Dungee indicated that his work schedule has created difficulty in his engagement with the random tests. Previously, Dungee attempted to leave work early and his supervisor said, "that wouldn't be advised." Dungee also indicated that he had difficulty with testing when he lived with his grandmother because he had limited transportation after wrecking his car. Once Dungee

_____

[26] Dungee testified that he works with Universal Electric, a job he has held since November 2021.

obtained a new car, he began testing again. Nevertheless, Dungee acknowledged providing Caseworker Eisengart with a multitude of reasons for failing to consistently test.

Dungee also addressed a positive test for cannabinoids and methadone indicating that, he only became aware of the results during the Court hearing. Dungee challenged these findings indicating that, he doesn't do drugs. Dungee requested a re-test in August and learned in Court that the results were deemed a false positive for methadone. Since that time, Dungee has requested a change from oral to urine tests.

Dungee testified that he began drug and alcohol treatment in January and/or February of 2022. Initially, he was unable to find a provider due to evaluations suggesting no need for additional treatment. The recommendations for no further treatment were provided despite the fact that he was on bond facing federal drug charges. Dungee also encountered problems with his insurance. Dungee indicated that Caseworker Eisengart referred him to AAR and he eventually treated with AAR in early 2022.

Testimony next turned to Dungee's mental health treatment history. Dungee testified that he currently has no medication prescribed for his mental health. In 2019, he was evaluated at Southwestern Pennsylvania Human Services (SPHS) CARE Center and received a prescription for buprenorphine for anxiety. Dungee treated with the CARE Center for a period and then left. Per Dungee's testimony, in 2021, he returned to the CARE Center, however "they could not accommodate his hours." Caseworker Eisengart eventually helped Dungee find a new provider with Christian Counseling Associates (CCA) and Dungee began working with Katherine Davis for mental health therapy. According to Dungee, the main focus of his treatment with Davis was anxiety with panic attacks.

Dungee indicated that in April of 2021 he obtained housing and he has had no further issues with housing. Dungee also testified that he completed batterer's intervention counseling with Kate Vozar in December of 2021.[27] He continued by summarizing that he has maintained housing and a job, has not been in trouble, doesn't do drugs and attends mental health counseling. Dungee testified that he failed one (1) test from the federal government in September of 2021 with cannabinoids. Re-stating that he doesn't do drugs, Dungee testified that he uses no marijuana presently and only uses a vape pen.

In further illustration of his efforts to comply with Court ordered services, Dungee testified that he did parenting education with two (2) people and finished this service successfully and first of all requirements. He also indicated that he signed all requested releases, with the exception of CCA and Katherine Davis, who was requesting $50 for each release. Dungee indicated that he missed his older son's prom in order to visit with J.D. and rarely missed a visit.

Dungee testified that he is an entertainer and would sing, dance and listen to music with J.D. He would provide J.D. with gifts for holidays and his birthday and he rotates purchasing shoes for all five (5) of his children. Dungee continued that he also purchases snacks, including hoagies, bananas and PBJ for J.D., noting that J.D. "likes to eat." Indicating that he saw Jaime Chambers give J.D. applesauce and raisins, Dungee testified that J.D. doesn't like juice, only water. Dungee acknowledged that he didn't always bring snacks noting that, "Jamie used to do it, we were cool like that." Dungee testified that he had pretty bad communication with the Agency and so he would talk to Jaime and Carly the case aid, more than Paige Eisengart. However, more recently, Dungee indicates improved communication with Ms. Eisengart.

---

[27] Record establishes that batterer's intervention counseling was completed on January 24, 2022.

Dungee indicates that he has had no contact with Angela Dungee (Minor Child's mother) since December of 2021. Stating, "the judge said action speaks louder than words, so I went to work." Dungee testified that problems with Angela Dungee were that "she was immature, never wanted to be in the house and was not family oriented." He stated that he "did everything he could to help her with J.D."

When asked about his pending federal sentencing, Dungee indicated that he is scheduled for sentencing on October 4, 2022 on the charge of Conspiracy to Distribute a Large Amount of Cocaine. While he could be sentenced thirty (30) to thirty-seven (37) months, he may also receive house arrest and he believes that he will receive the minimum sentence. Dungee noted that he is confident that he has followed all the rules and regulations of his pre-sentence release.

Dungee testified that he "had no problem" with Jim and Jaime, the fosterparents for J.D., until CYS was involved. Dungee testified that all of his other children see one another, but J.D. has no contact with any of them and is not seeing his side of the family. Dungee stated, "Jim and Jaime aren't on their own, he has family on this side." "I don't need them to regulate me with my child, the federal offense happened before J.D. was born." Dungee indicated that he has a great relationship with J.D., calling the child "bossy and laughing." *He would like to spend more time* with J.D., saying that the Minor Child's relationship with his paternal family is "non-existent at this time." Dungee continued by stating that he didn't have a father and he wanted to know why his dad wasn't around, "it affects me to this day because things were different for me than other children." Dungee stated, "because my dad wasn't there makes me be different with my son. I know how to make the music and [J.D.] keeps going and dances." Dungee indicated that he has even created a song for his son called, "Tribe of J.D.," where he expresses that he will

"never go back on his son and will be fighting for his son." Dungee indicates that the song is because he can't change his past but can do his best from this point on.[28]

On cross-examination from the Agency solicitor, Dungee acknowledged that he is diagnosed with mood disorder and bi-polar and has a problem with drinking alcohol.[29] Dungee also indicated that his pre-trial services require him to engage with mental health for panic attacks.[30] *Dungee also acknowledged that J.D. is in good care.*

On cross-examination from the GAL, Dungee admitted that he previously focused on his marriage more than on his son, but now recognizes that his son comes before everything. Dungee acknowledged that he hasn't gone to the hospital for J.D. and hasn't gone to J.D.'s doctor's appointments. However, Dungee indicated that he would talk to Jaime to get information about J.D.'s medical information. In addition, Dungee indicated that he "offered to go" to the emergency hospital visit for J.D., but felt he "didn't need to leave work when one of them was already there." When asked about the effect on J.D. of being removed from Jim and Jaime, his long-term placement, Dungee stated that, "he will have to adjust... he is young... he will be able to adjust." Dungee completed his testimony indicating that *he just wants J.D. to have a relationship with all sides of his family.*

---

[28] This Court looked for any statement of Father that he wished for reunification with his son or wished to care for his son and found none. Dungee's testimony regarding his wishes focuses on "spending more time with his son" and having his son spend more time and get to know his side of the family. *See also*, evaluation of Dr. Crabtree of June 23, 2022, wherein it is stated, "It was implied during conversation with Mr. Dungee that even if he is not the primary physical custodian, he would like to have some time with his son so that his son could continue to develop a relationship with him and get to know his extended family." While not determinative of the outcome, this Court found the absence of a more direct request for reunification curious.

[29] Dungee testified to these issues as present issues, not areas alleviated and/or under control.

[30] Consistent with the purpose for which Dungee, by his own testimony, sought treatment from Katherine Davis.

9) Grace Capone, Clinical Supervisor, Southwestern Pennsylvania Human Services (SPHS)

Grace Capone, Mental Health Clinical Supervisor at SPHS provided testimony indicating that she performed Dungee's discharge and reviewed his file in preparation for the hearing. Capone's testimony was difficult at times to follow, however she testified that Father has a history with SPHS dating back to 2018 and he has treated for both drug and alcohol and mental health. During his first engagement with SPHS, Dungee attended ten (10) mental health sessions and one (1) drug and alcohol session and then "disengaged." Dungee was discharged after attending mental health sessions in April 2019 due to non-attendance and the office's inability to reach him. Dungee was discharged from drug and alcohol treatment after SPHS determined that he did not need the service, however the 2018 engagement was resultant of a CYS referral with the original recommendation of weekly mental health and drug and alcohol sessions.

In September 2019, Dungee was again referred to SPHS from adult probation. During the 2019 referral, Dungee was consistent for over thirty (30) mental health sessions, where he continued until November of 2021, when he was discharged for non-attendance paired with his failure to contact his therapist. Dungee's prognosis was poor at that time.

In January of 2022, Dungee was again referred to SPHS for mental health and drug and alcohol services. This referral was from CYS and pre-trial probation. Dungee failed to regularly and consistently attend services, only attending the intake session. Dunge was later discharged for non-attendance. February of 2022 was when the SPHS center had its last contact with Father.

Capone indicated that Father had a generalized anxiety disorder diagnosis but SPHS had no documentation of any medication. Capone testified that Father has no history of drug use on record. Father self-reported any drug issues or concerns. In addition to the anxiety, Capone

indicated that Dungee has a history of Agoraphobia and Major Depressive Disorder, both diagnosed in 2019 by a SPHS psychiatrist when he returned to care.

## 10) Jodi Lynn Axe, AAR supervisor

Jodi Lynn Axe of AAR, provided testimony regarding Dungee's treatment. Although Axe did not personally treat Dungee, she served as the supervisor for his former therapist, Haley Stroop. Axe now serves as Custodian of the Records of Father's Case Notes and testified in place of Stroop due to Stroop leaving the Group.

Axe testified that *Dungee began treatment with AAR on February 7, 2022.* He arrived based on a self-referral for drug and alcohol treatment services. He was in outpatient therapy that involved both group and individual sessions. Axe testified that Dungee was "very compliant" and attended all sessions, missing only one (1), that was promptly rescheduled.

AAR requires urinalysis screening for an extensive list of substances, including: alcohol, metabolites, opiates, heroin, methadone, fentanyl, cocaine, K2, spice, vivitrol, and methamphetamine. This weekly testing is unannounced and performed every time a client presents for services. Dungee participated in this testing which was collected by AAR and sent to Quest Diagnostics for analysis and results. All tests taken by Father were negative except for the initial test. There were no concerns with Father's tests.[31]

---

[31] The drug tests are done in a double locked bathroom after removing jackets and anything in their pockets in an empty room. The samples are tested to see if there are any alteration and Father's samples were never problematic.

11) <u>Jamie Chambers,  Maternal Step-grandmother and kinship caregiver</u>

Jamie Chambers testified that Father only asked to attend a single doctor's visit. Chambers testified that, at that time, she told Father not to come to a doctor's appointment because there was a limit on the number of people who can attend a doctor's appointment at any time. Chambers testified to observing visits between Father and J.D., in her home when J.D. was approximately two (2) or three (3) months old.  Father would hold the child for a little bit and then hand the child to Angela, Minor Child's mother.

Chambers testified that she intends for J.D. to keep in contact with Father,[32] and stated that generally, she does not have any issues with Father, but that she has been fearful of him when he fought with Child's Mother.  In a final note, Chambers acknowledged that, although sometimes the improper size, Dungee did provide gifts for J.D.

<u>Review of Relevant Legal Standards and Application to Present Case</u>

"In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so." *In re N.W.*, 859 A.2d 501, 506 (Pa. Super. 2004).  The standard of clear and convincing evidence is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of the precise facts in issue." *In Re C.M.S., 832 A.2d 457, 461-642 (Pa. Super. 2003).*

The focus of a termination proceeding is the conduct of the parents with "adequate consideration" being given to the needs and welfare of the child.  *Id.* at 508.  Further, under

---

[32] Chambers also testified that Paternal Great Grandmother was offered an opportunity to visit with J.D. but she declined.  No other members of Dungee's family have contacted the Chambers about visiting with J.D..

the Adoption and Safe Families Act, "when a child is placed in foster care, after reasonable efforts have been made to establish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.**" *In re B.L.L., 787 A.2d 1007,1016 (Pa. Super. 2001),* citing 42 U.S.C. §671, *et seq.* (Emphasis added).

Termination of parental rights is a bifurcated analysis. First, analysis is made under Section 2511(a) to determine if the parents' conduct merits termination of parental rights. The Court need only agree with *any one* subsection of § 2511(a), in addition to § 2511(b), in order to grant the termination of parental rights. *In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).* If the analysis of Section (a) leads to an affirmative response, the court must then make an analysis under Section 2511(b), a determination of the needs and welfare of the child, under the standard of best interests, where one major inquiry is the bond between the parent and child and the effect of severing any bond. *In re Adoption of C.D.R., 111 A.3d 1212 (Pa. Super. 2015).* Absent a showing by clear and convincing evidence that a parent's rights should be terminated, no such termination may occur. *In re Adoption of M.A.R., 591 A.2d 1133 (Pa. Super. 1991).*

In the instant case, the Agency filed a Petition for Termination of Parental Rights under 23 Pa. C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and § 2511(b).


<u>Section 2511(a)</u>

Under § 2511(a)(1), termination of parental rights may be granted when a "parent by conduct continuing for a period of at least six months immediately preceding the filing of the

petition either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties.

In the present matter, the Petition for Involuntary Termination of Parental Rights was filed by the Agency on February 1, 2022. Accordingly, the relevant time period for evaluation is August 2021 through January 31, 2022. During this time frame there were two (2) permanency review hearings on August 17, 2021 and December 14, 2021. At the August 17th hearing, Father was found to have minimal compliance with the permanency plan and no progress in alleviating the circumstances which necessitated the original placement. Visitation remained supervised at intervals of once per week for two (2) hours in duration. The order specifically provides "permission to expand after Mr. Dungee participates in three consecutive visits." *See Permanency Review Hearing Order of August 17, 2021, attached in CYS collective exhibit 5.* In addition, Dungee was ordered to the following:

- Complete drug and alcohol testing at the Washington County Drug Testing Center, twice monthly through random selection or upon a reasonable suspicion of intoxication or impairment.
- Complete drug and alcohol treatment through an appropriate provider and follow all recommendations.
- Follow the recommendations of Dr. Crabtree, Licensed Psychologist, evaluation dated May 26, 2021.
- Complete intensive mental health treatment through an appropriate provider and follow all recommendations.
- Obtain and maintain safe and stable housing.
- Sign all releases requested by the Agency.
- Attend parenting education.
- Complete domestic-violence counseling through an appropriate provider and follow all recommendations.

*Id.*

At the December 14, 2021, permanency review hearing, Father is again found to have minimal compliance with the permanency plan and no progress toward alleviating the

circumstances which necessitated the original placement. *See Permanency Review Hearing Order of December 14, 2021, attached in CYS collective Exhibit 5.* The Order specifically notes that Father has attended visitation and obtained housing, but has not shown for drug and alcohol screenings or mental health treatment.[33] *Id.* With the Minor Child in placement eleven (11) months, Father had failed to engage in services first ordered at the initial adjudication in January of 2021. Of specific note, exhibits admitted at the time of the hearing show that SPHS had closed Father's case for his failure to engage in mental health treatment, with the last date of service being August 2021. An additional exhibit established that Father failed to appear for random drug screenings between June of 2021 and the time of the hearing. A further exhibit provided that both Mother and Father were charged on July 20, 2021with Indirect Criminal Contempt for violation of a Protection from Abuse Order.[34] *Id.* Visitation remained the same, but concerns were noted with Dungee and Chambers encountering one another at visits and a specific directive was included in the Order, prohibiting both parties from remaining in the vicinity of the visit ten (10) minutes before and/or after the visits. *Id.* Notably, domestic violence and the impact of domestic violence on Dungee's ability to parent being a preeminent issue at the time of shelter and adjudication.

The secondary and emerging issues in the infancy of the Dependency case, including shelter and adjudication, involved parental substance abuse and mental health issues. Pursuant to the TPR testimony of Grace Capone, in November 2021, Dungee was discharged from SPHS mental health services for non-attendance and failure to contact his therapist. The record also establishes that in the same time frame, concerns with parental substance abuse remained

---

[33] Record establishes that Father had also not completed batterer's intervention counseling as of the hearing date. Testimony and records establish that this was completed on January 24, 2022.
[34] Dungee's Indirect Criminal Contempt Charge was ultimately withdrawn by the Washington County Office of the District Attorney with notation that Victim (Angela Dungee) failed to appear.

unaddressed and this was further illustrated by Father's inconsistency with random testing, failure to participate in drug and alcohol treatment as ordered and failure to resolve his outstanding federal drug charges.

Considering this history, this Court is tasked with determining whether Dungee's conduct "evidenced a settled purpose of relinquishing parental claims" or if he failed and/or refused to perform parental duties in this time frame.[35]

Despite failing to be fully compliant and/or consistent, Father did attend visits, did complete some services, albeit lacking in regularity, and did make efforts to attend hearings for the Dependency matter. Accordingly, it is this Court's opinion that, while Dungee was far from fully compliant and even farther from advancing progress with alleviating the circumstances leading to placement, in a light most favorable to Father, in the six (6) months immediately preceding the filing of the petition he did not evidence a settled purpose of relinquishing parental claims. Consequentially, this Court does not find that Father demonstrated a settled purpose of relinquishing parental rights.

This Court must next consider if Father failed or refused to perform parental duties. While admittedly difficult to define precisely, Pennsylvania Courts have found that "parental duty is best understood in relation to the needs of a child." *In re K.Z.S. 946 A.2d 753,759 (Pa. Super. 2008)*, citing: *In re B., N.M., 856 A.2d 847 (Pa. Super. 2004).*

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held

---

[35] *See In re C.M.S., 832 A.2d 457,462 (Pa. Super. 2003), quoting Matter of Adoption of Charles E.D.M., II, 708 A.2d 88,91 (Pa. 1998)*, stating "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties."

that the parental obligation is a positive duty which requires affirmative performance.

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.*

*Id.*

There is no question that Father loves J.D., what must be evaluated is whether he performed parental duties to support the needs of J.D., most importantly considering the mental, physical and emotional needs of the Minor Child. The record is void of support for this finding and only establishes that Father took negligible steps in the care of his son. Father allowed others to provide for his Child's basic needs, while he provided excuses for his non-performance, and inconsistent and/or absent compliance with services designed to support his ability to reunify. Testimony and evidence supports a record that paints a picture of Father failing to attend Child's medical appointments and failing to attend Father' Court ordered services with commitment and regularity, all being explained through a multitude of excuses by Father. Dungee even failed in providing the very basic of support, acknowledging through his own testimony that only two (2) or three (3) months before the TPR hearing did he begin bringing provisions for the Minor Child to visits. Prior to that time, he testified that Jaimie Chambers provided the supplies for the visits, including snacks and diapers. Considering that Father testified that parenting education was one of the first things that he completed in the Court ordered services, these actions should have been initiated by Father much earlier.[36] And while

---

[36] *See citation of Dr. Crabtree report of June 23, 2022:*
"Father presents with a sincere interest in maintaining a relationship with his son. On the other hand, it is not clear that he has enough knowledge about issues related to child development and to specific needs his child has, to be the primary caregiver for the child."

Father eventually did provide visitation provisions for J.D., it was only a more recent development.[37] Father testified to his attention and management of daily affairs being focused on pretty much everything else, while others cared for the daily needs of J.D.. Dungee resisted and refused consistent and effective participation and utilization of services designed to promote his ability to reunify, while J.D.'s needs and welfare were attended to by others.

As stated by Dr. Crabtree, with "a parent facing the loss of a Child the concerns of the Agency should be paramount." This Court does not believe that Father resisted obstacles to the parent/child relationship and failed to prioritize his parenting of J.D. Accordingly, this Court finds that the Agency has established, by clear and convincing evidence, grounds for termination under 23 Pa. C.S.A. 2511(a)(1).

## Section 2511(a)(2)

The Agency next asserts grounds for termination under §2511(a)(2). Pursuant to §2511(a)(2), the rights of a parent may be terminated if the repeated and continued incapacity, abuse, neglect or refusal of a parent has caused a child to be without essential parental care, control or subsistence necessary for his or her physical or mental well-being and the conditions and causes of incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This subsection doesn't emphasize a parent refusal or failure to perform duties, but places the focus on a child's present and future needs for "essential care, control or subsistence necessary

---

[37] *See recitation of Father's TPR testimony*: Dungee continued that he also purchases snacks, including hoagies, bananas and PBJ for J.D., noting that "J.D. likes to eat." .....acknowledged that he didn't always bring snacks... "Jamie used to do it, we were cool like that." *See also: recitation of Sonafelt-Cuseard TPR testimony*: indicating that Dungee started bringing supplies to the visit with J.D. one (1) or two (2) months ago. (Testimony provided on September 19, 2022).

*See 23 Pa. C.S.A. §2511(b), Other Considerations-* .... "*With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.*"

for his physical or mental well-being." *In re Involuntary Termination of Parental Rights to E.A.P., a minor, 944 A.2d 79,82 (Pa. Super. 2008)*. Courts are instructed by this section to focus on the need of a child for a stable home and "strong, continuous parental ties" particularly where "disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties. *Id.* quoting *In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002)*.

As noted by the Superior Court in *In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010)*, "while sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)." Quoting, *In re Adoption of M.J.H., 501 A.2d 648 (1985) (Additional citations omitted)*. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *In re B, N.M., 856 A.2d 847, 855 (Pa. Super. 2004)*. A "parent desiring to retain parental rights must exert himself to take and maintain a place of importance in his child's life." *In re E.A.P., 944 A.2d 79, 83-84 (Pa Super. 2008), quoting: Adoption of Baby Boy A, 517 A.2d 1244,1246 (Pa. 1896)*. Section 2511(a)(2) does not outline a time line for performance or evaluation of performance and accordingly, the case time line can be evaluated as a whole.

In the present matter, the Minor Child is twenty-four (24) months old and has been out of parental care and in the care of maternal grandparents for twenty-two (22) of those months. During this time, the minor child's various needs were met by his caregivers, not his parents. While Father indicates that "he will do anything to maintain contact with his child," the history of his compliance and progress paint a different story. While at the time of the TPR hearing,

Father had completed a few Court ordered services, and initiated participation with others, by his own testimony, he waited until the Minor Child was over a year old and developing a strong, consistent and reliable bond with Maternal Grandparents before addressing the lion share of issues bringing in J.D. into care. While Father waited to participate in services, succumbed to barriers for completion and by his own testimony, prioritized his marriage and employment over his relationship with his child, the Minor Child was being cared for by others. As discussed above, at the time of the filing of the Petition for Termination of Parental Rights, it is unrefuted that Dungee failed to engage in the most essential Court ordered services that would have aided him in progressing through and perhaps alleviating entirely the cause for J.D.'s placement coming into care. Father testified that his change in motivation was based on the Court's statement that, "actions speak louder than words," however his compliance and participation was also conveniently timed in preparation for his federal sentencing.[38] While this Court cannot state that his efforts were solely in an effort to curry favor with the pending sentencing court, the record does support a conclusion that Father's compliance and periods of inconsistency have a strikingly similar pattern to periods when Father has heightened supervision due to probation or other interventions. Accordingly, in considering whether Father took every action necessary to maintain a place of importance in the life of J.D., this Court is of the opinion that he did not.

As may be apparent from the above discussion, this Court is also of the opinion that Father cannot or will not remedy the conditions and causes of incapacity that have caused J.D. to be without parental care, control or subsistence necessary for his physical and mental well-being. Father's history supports periods of compliance, followed by periods of non-performance and

---

[38] While photo finishes may be common place in marathons and horse races, photo finishes are not compatible with parenting a child. A child's needs and welfare of cannot be subjected to a late start, standard procrastination and/or casual attention with reliance on others to serve in the primary capacity of parent.

inconsistency. This can be stated as to Father's mental health, substance use, testing and treatment, and domestic violence history. Consequentially, even should the Court deny the Agency request for termination of parental rights, the Court would have no confidence in the ability to immediately place the Minor Child in the care of Father, finding short term prospects for re-unification unlikely. Father is still not in a position stable and/or consistent enough for the Minor Child to be placed in his care.[39]

Evaluated as a whole, this Court finds that the Agency has established by clear and convincing evidence that Dungee's repeated and continued incapacity, neglect and/or refusal to provide proper parental control for J.D., (fueled by concerns of domestic violence, substance abuse and mental health concerns), has caused J.D. to be without essential parental care, control or subsistence necessary for his physical or mental well-being. This Court also finds clear and convincing evidence that the conditions and causes of incapacity, neglect and/or refusal will not be remedied by Dungee. Accordingly, this Court finds sufficient grounds for termination under 23 Pa. C.S.A. §2511(a)(2).

---

[39] Father remains on probation for the federal drug charges. Four (4) year probationary sentence on October 7, 2022. Father has never progressed to unsupervised visitation and has failed to take advantage of additional visits offered by the Agency and approved by the Court. Father has failed to participate in mental health treatment that specifically addresses the recommendations of Dr. Crabtree and has failed to consistently engage in random testing. In addition, because Father is subjected to restrictions as a result of his federal probation, there is no evidence to suggest his ability to address the Minor Child's daily needs, medical needs and/or education needs. While Father presented the testimony of his family members that stepped forward as placement resources, which is more appropriately an issue for the Dependency matter, Father provided no details on his plan to re-unify and support J.D.. Father indicated that he would like to spend more time with J.D. and further indicated that he wanted J.D. to know "his side of the family" but set forth no plan of execution. By his own testimony, Father indicated that Jaime Chambers, until recently, provided for all of the Minor Child's needs.

Additionally, during this Court's deliberation on the TPR request, another permanency review hearing was conducted in this matter finding that Dungee had minimal compliance and no progress. The Order also specifically notes that Father has not maintained sobriety and has not engaged in mental health treatment as recommended by Dr. Crabtree. *Permanency Review Hearing of December 12, 2022.* While information contained in the hearing cannot be relied upon as definitive of this Court's finding in the TPR, it is persuasive evidence that supports this Court's theory of Father's present inability to care for J.D. as a result of inconsistency with Court ordered services, provided to aid Father in steps to independent reunification with J.D.

<u>Section 2511(a)(5)</u>

Pursuant to Section 2511(a)(5), termination of parental rights may be granted when, "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."

As discussed more thoroughly above, J.D. has been out of parental care in excess of six (6) months. The conditions leading to the removal or placement of the Child, domestic violence, unstable housing, concerns with substance abuse, mental health and the inability to provide safe and stable parenting for J.D. have not all been remedied and resolved. As previously discussed in this Court's evaluation under Section 2511(a)(2), the Court also finds that Father cannot or will not remedy those conditions within a reasonable period of time. To Mr. Dungee's credit, his was not completely uninvolved and following filing of the TPR petition, he began to participate and complete Court ordered services. (albeit on his own time as opposed to a time frame that may have accelerated his ability to care for J.D.). Dr. Crabtree testified it would have been possible for Father to have taken steps to reunify with the child in three (3) months, which is supported by the fact that Father did engage in many services immediately prior to and/or after the filing of the TPR petition. Father waited to initiate his engagement and/or was inconsistent when he began to engage, resulting in an inability of the Court to gauge his progress in alleviating circumstances. This was amplified by his inconsistency and lack of compliance with

services and his failure to demonstrate that the services were assisting with Agency concerns. Nevertheless, having found sufficient grounds for terminating parental rights pursuant to §2511(a)(1) and (a)(2), this Court elects to make no further analysis of the Agency request under §2511(a)(5).

Section 2511(a)(8)

Subsection 2511(a)(8) states that the termination of parental rights may be granted when, "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

In the present matter, although the Agency filed a petition for the termination of parental rights a mere twelve (12) months following the Child's placement, at the time of the TPR hearing, the Minor Child was in placement in excess of eighteen (18) months. Furthermore, as discussed in detail above, this Court finds that the conditions which led to the removal or placement of the child continue to exist to the present date. Therefore, this Court is left to consider whether termination of Dungee's parental rights best serves the needs and welfare of J.D., to which this Court also answers in the affirmative.

It is this Court's finding that terminating Father's parental rights best serves the needs and welfare of J.D. Father acknowledges that the Minor Child is well cared for by Foster Parents and acknowledges that Foster Parents take care of J.D.'s daily needs. Father has never been tasked with providing for J.D.'s daily needs and has not had independent custody

of the Minor Child since he was approximately two and one half (2 ½) months old.[40] At the time of the filing of the TPR hearing, Father had failed for nearly two (2) years to resolve the problems leading to the Minor Child's placement in care and evidence suggests that he would be unlikely to correct such issues in a reasonable time period to allow for J.D.'s return to his care. This Court finds that it would not serve the Child's needs and welfare to place his life on hold for additional time for Father to establish that he is in a stable place and possessing the ability to care for the Minor Child's daily physical, mental, emotional and educational needs.

While it is recognized that Father has had more substantial compliance, there has not been a dramatic shift in the finding of progress in alleviating the circumstances resulting in removal. Additionally, most of the significant areas of Father's compliance occurred after the filing of the Petition for TPR. As previously cited, in subsection of 2511(b), the statute specifically provides, in part, "with respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition. *23 Pa. C.S.A. 2511(b)*. Termination under Section 251 l(a)(8) does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." *In re Adoption of C.J.P., 114 A.3d 104, 1050 (Pa. Super. 2015), citing In re Adoption of R.J.S., 901 A.2d 502, 511(Pa. Super. 2006)*. Our Courts have said, "we recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for

---

[40] Father's primary custodianship was done with assistance of the biological Mother, Angela Chambers. There was no testimony suggesting Father has ever exercised parental duties alone and without the assistance of another person, whether that be biological Mother, a case aid, another relative or a parenting coach.

termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanency and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit, eighteen (18) months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care. *In re Adoption of C.L.G., 95 A.2d 999, 1005 (Pa. Super 2008), quoting trial court opinion.*

This Court finds that the Agency has established by clear and convincing evidence the three (3) elements required by Section 2511(a)(8).


Having found the Agency has established clear and convincing grounds for termination of parental rights under Section 2511(a)(1), (a)(2) and (a)(8), this Court must now turn to the second requirement of the Adoption Act.


## Section 2511(b)

In the second vein of inquiry in a termination petition, the Court must evaluate if the Agency has sustained its burden under 2511(b). This subsection requires that "the court in terminating the rights of a parent [to] give primary consideration to the developmental, physical and emotional needs and welfare of the child." Section 2511(a) requires a focus on the parent when terminating parental rights, but § 2511(b) requires a focus on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) *(en banc)*. *Section 2511(b)* has been interpreted as a "best interests" and "bond" analysis. The Court should consider the "importance of continuity

of relationships to the child, because severing close parental ties is usually extremely painful...the court must consider whether a natural parental bond exists between child and parent and whether termination would destroy an existing, necessary and beneficial relationship." *In the Interest of K.Z.S. 946 A.2d 753 (Pa. Super. 2008).*

"Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re K.K.R.-S., 958 A.2d 529, 533 (Pa.Super.2008).* "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M, 33 A.3d 95, 103 (Pa.Super.2011) (citing K.K.R.-S., 958 A.2d at 533-36).*

"[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent- child bond can be severed without detrimental effects on the child."

*Id. (quoting In re A.S., 11 A.3d 473, 483 (Pa.Super.2010)); see also In re T.D., 949 A.2d 910, 920-23 (Pa.Super.2008), appeal denied, 601 Pa. 684, 970 A.2d 1148 (2009)* (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of

parenthood," and where preserving Parents' rights would prevent T.D. from being adopted and attaining permanency). *In re Adoption of C.J.P., 114 A.3d 104, 1050 (Pa. Super. 2015).*

While recognizing that J.D. has a bond with Dungee, Dr. Crabtree's testified that the primary bond of the minor child is with his caregivers, Maternal Grandfather and Step-Grandmother. Crabtree accredited Maternal Grandfather with helping Father foster his bond with J.D.. In fact, Crabtree premised a recommendation for increased visitation between Dungee and J.D. on the increase not negatively impacting the Minor Child's bond with his caregivers. Crabtree testified, consistent with his bonding analysis report, "there is a bond between J.D. and his maternal grandparents and there is a bond between J.D. and his father..... this evaluator concludes that the child would not suffer if the bond between the child and father were to be severed and the child continued to live with his maternal grandparents. Additionally, and most importantly, Crabtree opined that the Minor Child would suffer no psychological harm if termination of parental rights was granted as to Father, but that it would be "deleterious to the Child" to separate him from his Grandparents. In further support of his position, Crabtree testified that: "the Minor Child has a secure bond [with Grandparents] that should not be disturbed; "Father as primary caregiver is not in the best interest of the child;" and Minor Child's "best interests are best served if he is in the continuous care of the Grandparents." Father did not refute the conclusions of Crabtree and Father's testimony supports the conclusions voiced by the expert.

Based on the above, the Court finds that the Agency has established through clear and convincing evidence the elements of 23 Pa. C.S.A. § 2511(b).

This Court having found that the Agency has established the requirements of 23 Pa. C.S.A. §2511(a)(1), §2511(a)(2), § 2511(a)(8) and §2511(b) of the Adoption Act, by clear and

convincing evidence, it is hereby ORDERED, ADJUDGED, and DECREED, that the parental rights of Sean Dungee, II to minor child Judah Jacorey Dungee are hereby TERMINATED forever.

The parental rights of Sean Dungee, II being hereby terminated, legal and physical custody of the Minor Child, Judah Dungee shall remain with Washington County Children and Youth Social Services and the Agency may proceed with adoption.

BY THE COURT:

_____

FILED

JAN 1 0 2023

JAMES ROMAN
REGISTER OF WILLS